## UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| RAJA RAJENDRAN, | : | CIVIL NO. 3:22-CV-00581 |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | (Magistrate Judge Schwab) |
| | : | |
| CHRISTINE WORMUTH, | : | |
| Secretary of the Army, | : | |
| | : | |
| Defendant. | : | |

## <u>MEMORANDUM OPINION</u>

### I. Introduction.

The plaintiff, Raja Rajendran ("Rajendran"), claims that his former

employer, the United States Department of the Army ("the Agency") suspended

him, demoted him, and denied him training due to his national origin and in

retaliation for reporting this discrimination.  He brings these claims under Title VII

of the Civil Rights Act of 1964 ("Title VII"). 42 U.S.C. § 2000e *et seq.*  Rajendran

also claims that the Agency[1] failed to reinstate him to a status quo position, thereby

violating an Order issued by the Office of Federal Operations ("OFO").  Currently

---

[1] The named defendant is Christine Wormuth ("the Secretary"), in her
official capacity as the Secretary of the Army, the head of the agency for which
Rajendran worked. *See Wadhwa v. Secretary, Dept. of Veterans Affairs*, 505 Fed.
Appx. 209, 213 (3d Cir. 2012) ("First, the only proper defendant in a federal
employee's Title VII action is the head of the appropriate agency.").

pending is the Secretary's motion for summary judgment.  For the reasons discussed below, we will grant in part and deny in part the Secretary's motion for summary judgment.

## II.  Background and Procedural History.

Rajendran began this action by filing a complaint under Title VII against the Secretary in the United States District Court for the Eastern District of Michigan on January 3, 2022, for discrimination on the basis of his national origin[2] and retaliation. *Doc. 1*.  After being served (*doc. 8*), the Secretary filed a motion to dismiss or transfer venue (*doc. 10*).  The United States District Court for the Eastern District of Michigan transferred the case to the United States District Court for the Eastern District of Pennsylvania pursuant to a stipulated Order. *Doc. 13*. Following the transfer, on April 13, 2022, Rajendran filed an amended complaint against the Secretary, this time bringing claims under both Title VII and the Pennsylvania Human Relations Act ("PHRA"), as well as a claim for failure to obey the OFO Order. *Doc. 17*.  On April 14, 2022, the Secretary filed an unopposed motion to transfer venue to the United States District Court for the Middle District of Pennsylvania. *Doc. 19*.  The United States District Court for the

---

[2] Rajendran writes in the amended complaint that his national origin is "Asian-Indian." *Doc. 17* at 3.

Eastern District of Pennsylvania granted this motion (*doc. 21*), and the case was transferred to this Court (*doc. 22*).

After being granted extensions of time to file a responsive pleading (*docs. 27, 33, 34*), the Secretary filed a partial motion to dismiss (*doc. 37*).  After briefing (*docs. 38, 42, 47, 48*), Judge Mannion granted in part and denied in part the motion to dismiss, dismissing all claims brought under the PHRA, all claims for punitive damages, the claim for hostile work environment, and all unexhausted claims. *Doc. 49*.  "The following claims, therefore, remain[ed]: (1) Count I for National Origin Discrimination-Disparate Treatment under Title VII;[3] (2) Count II for Retaliation under Title VII; (3) Count IV for Non-Compliance to the OFO's Order; and (4) Count V for Violation of Procedures under Title VII."[4] *Id.* at 37 (footnote added).

---

[3] Under Title VII, a plaintiff may bring a disparate treatment claim or a disparate impact claim.  While a disparate treatment claim alleges intentional discrimination, "[d]isparate impact redresses policies that are fair in form, but discriminatory in operation." *See Fields v. American Airlines, Inc.*, 19-903-KSM, 2023 WL 6391689, *19 (E.D. Pa. Sept. 29, 2023) (internal quotations omitted) (citing *Karlo v. Pittsburgh Glass Works, LLC*, 849 F.3d 61, 69 (3d Cir. 2017)). Here, Rajendran brings disparate treatment claims which we will hereinafter call "discrimination claims."

[4] Although Rajendran included a separate count for "violation of procedures," this count is more properly considered a continuation of his Title VII discrimination and retaliation claims as outlined in Counts I and II. *See doc. 17* at 18–32.  We construe the allegations Rajendran includes in Count V as allegations that the Agency violated its own procedure in its treatment of him because of his national origin or in retaliation for his protected activity. *See id.*

Upon review of Judge Mannion's Order (*id.*), the parties' briefs (*docs. 62–64*), and the amended complaint (*doc. 17*), the following more specific claims remain:

> (1)  A discrimination claim based on the Agency denying Rajendran training opportunities by outright denying requests to attend trainings and by intentionally making attending training so difficult that he was unable to attend ("training discrimination claim");
>
> (2)  A discrimination claim based on Rajendran's suspension ("suspension discrimination claim");
>
> (3)  A discrimination claim based on Rajendran's demotion ("demotion discrimination claim");
>
> (4)  A retaliation claim based on the Agency denying Rajendran training opportunities by outright denying requests to attend trainings and by intentionally making attending training so difficult that he was unable to attend ("training retaliation claim");
>
> (5)  A retaliation claim based on Rajendran's suspension ("suspension retaliation claim");
>
> (6)  A retaliation claim based on Rajendran's demotion ("demotion retaliation claim");
>
> (7)  A retaliation claim based on the Agency's failure to reinstate Rajendran in a status quo position ("status quo retaliation claim"); and
>
> (8) A claim for failure to abide by the OFO's Order.

*See doc 49*.

Rajendran also filed a motion for reconsideration of Judge Mannion's decision on the motion to dismiss (*doc. 51*), which Judge Mannion denied (*doc. 53*).  Judge Mannion referred this case to us for further pre-trial proceedings. *Doc. 50*.  The parties later consented to magistrate judge jurisdiction pursuant to 28 U.S.C. § 636(c). *Doc. 59*.

On June 13, 2023, the Secretary filed a motion for summary judgment on the merits of the above claims. *Doc. 55*.  The next day, we held a case management conference with the parties via telephone. *Doc. 54*.  During that conference, the parties agreed to proceed to summary judgment based on the extensive record, prior to proceeding to any discovery.[5] *See doc. 58*.  During the case management conference, Rajendran expressed his intent to hire counsel.  Accordingly, we stayed briefing deadlines and advised the parties that we would issue an Order regarding briefing the pending summary judgment motion after counsel for the plaintiff filed a notice of appearance or after July 14, 2023, if plaintiff did not obtain counsel. *Doc. 58*.  No attorney entered her appearance on behalf of Rajendran. *See docket generally*.  Thus, on July 17, 2023, we unstayed deadlines and set deadlines for briefing the motion for summary judgment. *Doc. 60*.

On July 31, 2023, the Secretary filed a brief in support of her motion for summary judgment (*doc. 62*) and a statement of facts (*doc. 61*).  On August 21, 2023, Rajendran filed a brief in opposition of the motion for summary judgment

---

[5] Although summary judgment typically is warranted only after adequate time for discovery, *see Doe v. Abington Friends School*, 480 F.3d 252, 257 (3d Cir. 2007), parties may agree to proceed prior to completing discovery.  A plaintiff seeking additional discovery prior to summary judgment must comply with Fed. R. Civ. P. 56(f) by "identifying 'with specificity what particular information is sought; how, if uncovered, it would preclude summary judgment; and why it has not previously been obtained.'" *Bradley v. United States*, 299 F.3d 197, 206–07 (3d Cir. 2002) (quoting *St. Sturan v. Virgin Islands Daily News, Inc.*, 21 F.3d 1309, 1314 (3d Cir. 1994)).

and a counter statement of facts. *Doc. 63*.  On September 5, 2023, the Secretary

filed a reply brief. *Doc. 64*.  The motion thus has been fully briefed.


### III.  Summary Judgment Standards.

The Secretary moves for summary judgment under Rule 56(a) of the Federal

Rules of Civil Procedure, which provides that "[t]he court shall grant summary

judgment if the movant shows that there is no genuine dispute as to any material

fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P.

56(a).  "Through summary adjudication the court may dispose of those claims that

do not present a 'genuine dispute as to any material fact' and for which a jury trial

would be an empty and unnecessary formality." *Goudy-Bachman v. U.S. Dept. of

Health & Human Services*, 811 F. Supp. 2d 1086, 1091 (M.D. Pa. 2011) (quoting

Fed. R. Civ. P. 56(a)).

The moving party bears the initial responsibility of informing the court of

the basis for its motion and identifying those portions of the record that

demonstrate the absence of a genuine dispute of material fact. *Celotex Corp. v.

Catrett*, 477 U.S. 317, 323 (1986).  With respect to an issue on which the

nonmoving party bears the burden of proof, the moving party may discharge that

burden by "'showing'—that is, pointing out to the district court—that there is an

absence of evidence to support the nonmoving party's case." *Id.* at 325.

Once the moving party has met its burden, the nonmoving party may not rest upon the mere allegations or denials of its pleading; rather, the nonmoving party must show a genuine dispute by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials" or "showing that the materials cited do not establish the absence . . . of a genuine dispute." Fed. R. Civ. P. 56(c). If the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden at trial," summary judgment is appropriate. *Celotex*, 477 U.S. at 322.

Summary judgment is also appropriate if the nonmoving party provides merely colorable, conclusory, or speculative evidence. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). There must be more than a scintilla of evidence supporting the nonmoving party and more than metaphysical doubt as to the material facts. *Id.* at 252. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

The substantive law identifies which facts are material, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248.  A dispute about a material fact is genuine only if there is a sufficient evidentiary basis that would allow a reasonable fact finder to return a verdict for the non-moving party. *Id.* at 248–49.

When "faced with a summary judgment motion, the court must view the facts 'in the light most favorable to the nonmoving party.'" *N.A.A.C.P. v. N. Hudson Reg'l Fire & Rescue*, 665 F.3d 464, 475 (3d Cir. 2011) (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)).  At the summary judgment stage, the judge's function is not to weigh the evidence or to determine the truth of the matter; rather it is to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249.  The proper inquiry of the court "is the threshold inquiry of determining whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Id.* at 250.

Summary judgment is warranted against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. *Celotex*, 477 U.S. at 322.  "Under such circumstances, 'there can be no genuine issue as to any

material fact, since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.'" *Anderson v. Consol. Rail Corp.*, 297 F.3d 242, 247 (3d Cir. 2002) (quoting *Celotex,* 477 U.S. at 323). "[S]ummary judgment is essentially 'put up or shut up' time for the non-moving party: the non-moving party must rebut the motion with facts in the record and cannot rest solely on assertions made in the pleadings, legal memoranda, or oral argument." *Berckeley Inv. Group, Ltd. v. Colkitt*, 455 F.3d 195, 201 (3d Cir. 2006).

## IV.  Material Facts.

The following facts are the material facts for purposes of the pending summary judgment motion.[6]

---

[6] Here, in accordance with Local Rule 56.1, the Secretary filed a statement of material facts, and Rajendran filed a response.  Rajendran's response, however, did not clearly follow the Secretary's statement of material facts, so it was, at times, impossible to establish where Rajendran disputed the Secretary's version of facts.  Where the facts are undisputed, we cite to the defendant's statement of material facts (*doc. 61*) and Rajendran's response thereto (*doc. 63-1*).  In accordance with our duty to "construe all facts and inferences in favor of the nonmoving party [,]" *Peroza-Benitez v. Smith*, 994 F.3d 157, 164 (3d Cir. 2021) (quoting *Santini v. Fuentes*, 795 F.3d 410, 419 (3d Cir. 2015)), where Rajendran disputes a fact set forth in the Secretary's statement of material facts and he cites record evidence creating a genuine factual dispute, we cite to Rajendran's version of the fact.  When citing to page numbers of a document, we use the page numbers from the CM/ECF header on the top of the document.

### A.  Rajendran's Employment at Tobyhanna.

On March 15, 2009, Rajendran began working at Tobyhanna Army Depot ("Tobyhanna") in Tobyhanna, Pennsylvania. *Doc. 61* ¶ 1.  Rajendran was hired as a Mechanical Engineer in the Maintenance Engineering Division, a developmental, "ladder" position at paygrade GS-9. *Doc. 61* ¶¶ 1, 4; *Doc. 63-1* ¶ 1.  Rajendran entered the job with a master's degree in mechanical engineering. *Doc. 61* ¶ 3; *Doc. 63-1* ¶ 12.  While working at Tobyhanna, Rajendran "maintained his [family] residence in Troy, Michigan[,] . . . where he would visit most weekends." *Doc. 61* ¶ 2.

For the first year of Rajendran's employment—from March 15, 2009, to March 15, 2010—he was a probationary employee. *Doc. 61* ¶ 1; *Doc. 63-1* ¶ 42. Rajendran's first-line supervisor for the first month of his employment was Dave Dudzinski ("Dudzinski"). *Doc. 61* ¶ 9.  But "[s]oon after he was hired, Rajendran's first line supervisor was Jeff Morman [("Morman")], Chief of the Avionics Engineer Branch, and his second line supervisor was Mark Viola [("Viola")], Chief of the Maintenance Engineering Division." *Doc. 61* ¶ 5.  "Morman was not supervising any other probationary employees during the time Rajendran worked for him." *Doc. 61* ¶ 6.

### B.  Morman's Derogatory Comments.[7]

In July 2009, or thereabouts, Morman "made inappropriate comments to [Rajendran] related to his national origin[.]" *Doc. 63-1* ¶ 27.  One workday, there were "donuts out for the employees" but Morman asked Rajendran not to touch them. *Id.*  Morman asked Rajendran "whether it was true that people from India 'wash [their] rear ends with bare hands' or 'eat with their bare hands' and then declar[ed] the practice 'nasty' and expressed dislike for these habits and worship monkeys [sic]." *Id.*

According to Rajendran, Morman also "was upset about people coming from India taking over the job market and encouraged a supervisor from another department to not approve training for Indians." *Id.* ¶ 28.  Further, Morman once "told [Rajendran] . . . [that] education was free in India and taking over the market and competing with Americans." *Id.* ¶ 29 (errors in original).

---

[7] Although Rajendran testified at a Fact-Finding Conference conducted by the Department of Defense in October 2010, that he had not heard Morman ever say anything derogatory toward him (*doc. 61* ¶ 7 (citing *doc. 61-4* at 72)), in his counter-statement of material facts Rajendran cites to his testimony in the EEOC hearing that took place on February 22, 2016, in which he alleges the following derogatory remarks (*doc. 63-1* ¶¶ 27–29) (citing *doc. 61-13* at 22–23, 38–40, 60–61).

### C.  Rajendran's Work Performance.

Although the Secretary states that Morman "encountered issues with Rajendran's performance" "[f]rom the beginning," (*doc. 61* ¶ 8), Rajendran refutes these allegations (*doc. 63-3* ¶ 89).  Regardless, it is undisputed that in June 2009, Morman had a conference with Rajendran and Dudzinski, "the individual he was working most closely with" because, according to Morman, "Rajendran was not completing tasks assigned to him[.]"[8] *Doc. 61* ¶ 9.  When Morman "did not notice any improvement," "he met again with Rajendran later [in June 2009,] and then approached others to get a better sense of Rajendran's performance, both good and bad[,]" a common practice at Tobyhanna. *Id.* ¶¶ 10, 11.

In response to Morman's inquiries, Dudzinski[9] stated that Rajendran's work performance was "extremely bad" because Rajendran did so little. *Doc. 61* ¶ 12; *see also id.* ¶ 13 ("In fact, Dudzinski thought that in 37 years he had never seen another employee do as little as Rajendran did.").  "One engineer in the commodities department said that he was 'getting more productive work from the

---

[8] Rajendran does not dispute that this meeting occurred, although he again disputes that his work performance was at all deficient. *See doc. 63-3* ¶ 89.

[9] Rajendran states that Dudzinski had previously received complaints about his work, similar to those Rajendran received, but Dudzinski was not written up and Rajendran was. *Doc. 63-3* ¶ 25–26.  But Rajendran cites only to emails in which various people express dissatisfaction with his work and no communications regarding Dudzinski's performance. *Doc. 61-3* at 242, 260, 262–267, 347; *Doc. 61-4* at 148.

students.'" *Id.* ¶ 14.  "Two other engineers with whom Rajendran was working complained that he was 'sitting' on his projects and 'taking forever' to get them done." *Id.* ¶ 15.  "Overall, Morman got the impression that Rajendran lacked motivation to be engaged with his projects and did not reliably complete them." *Id.* ¶ 16.

In August 2009, Morman presented to Rajendran a chart of the feedback he received. *Id.* ¶ 18.  Despite this bad feedback, Morman, encouraged by Dudzinski out of concern for Rajendran's mental health, "went out of his way to help Rajendran succeed and find a productive place at Tobyhanna." *Id.* ¶¶ 18, 19. Morman also "gave Rajendran a satisfactory end-of-the year rating" of "excellent." *Id.* ¶ 20; *see also doc. 63-3* ¶ 109.  The Secretary attempts to attribute this excellent rating to the "slight improvement" Morman noticed and Morman "want[ing] to give Rajendran 'the benefit of the doubt.'" *Doc. 61* ¶ 20.  During the year-end review, "Rajendran admitted that his performance needed to be improved and that he was 'behind' and 'not doing the proper paperwork to accomplish all the assignments given to [him].'"[10] *Doc. 61* ¶ 21 (alteration in original).

---

[10] Confusingly, Rajendran states in opposition to this statement: "Many of the tasks assigned to Plaintiff involved design and creation of engineering drawings.  They were not difficult but 'time consuming' and overwhelming." *Doc. 63-3* ¶ 33.

Shortly after the year-end review, "Morman received more negative feedback on Rajendran's performance, specifically noting that he 'doesn't do anything' and 'has to be led by somebody else' and that he is 'frankly inept at doing his job.'"[11] *Doc. 61* ¶ 22. "Morman therefore sent Rajendran an email in January 2010 conveying his concerns." *Doc. 61* ¶ 23. "The following month, Morman sent Rajendran a memo reviewing their discussions to that point and relaying new concerns." *Id.* ¶ 24. "Because Rajendran was a probationary employee nearing the end of his probationary term, a Performance Improvement Plan was not feasible."[12] *Id.* ¶ 25; *see also doc. 63-3* ¶ 58.

### D.  Design, Development, and Manufacturing Division.

In February 2010, Morman placed Rajendran in the Design, Development, and Manufacturing Division on a "bar loan" for 2 weeks ("Temporary Assignment to the Design, Development, and Manufacturing Division"). *Doc. 63-3* ¶ 95; *Doc. 61* ¶ 26. Although Rajendran was still employed as a GS-9 level mechanical

---

[11] Rajendran disputes the veracity of the statements reported to Morman but not that Morman received such reports. *Doc. 63-3* ¶ 73.

[12] Although Rajendran states that the "Agency found out it was too late to terminate Plaintiff or put him on PIP[,]" he contradicts himself, and the Secretary's Statement of Facts, stating, "[the] Agency drafted a plan for placing Plaintiff on a Performance Improvement Plan (PIP), however, they made only generic statements regarding Plaintiff's performance in the document." *Doc. 63-3* ¶¶ 58, 60–61.

engineer in the Maintenance Engineering Division under Morman, for purposes of this "bar loan" placement he was temporarily assigned to receive GS-7 technician level work from the chief of the Design, Development, and Manufacturing Division, Keith Hoffman ("Hoffman"). *Doc. 61* ¶ 26; *doc. 63-3* ¶ 95.  Hoffman "found Rajendran to be performing acceptably at the GS-7 level." *Doc. 61* ¶ 27.  In fact, "Rajendran acknowledges that he had been performing GS-7 technician work from the beginning of his tenure at Tobyhanna." *Doc. 61* ¶ 28.

On March 10, 2010, "Morman and Viola facilitated Rajendran being placed permanently under Hoffman in" the Design, Development, and Manufacturing Division. *Doc. 61* ¶ 29; *Doc. 63-3* ¶ 60.  Importantly, this transfer would include Rajendran's downgrade to a GS-7 level, although there were positions in that department at levels GS-5 through GS-12. *Doc. 63-3* ¶ 60, 99; *Doc. 61* ¶ 31.  On March 12, 2010, the "last day of [Rajendran's] probationary period[,]" Morman and Viola "discussed this opportunity with Rajendran[.]" *Doc. 61* ¶ 30; *Doc. 63-3* ¶ 40.  Morman would have terminated Rajendran at the end of his probationary period if Rajendran had not agreed to the new position. *Doc. 63-3* ¶¶ 41, 57, 63. Rajendran signed a document stating that "he was voluntarily accepting a downgrade from GS[-]9 to GS[-]7 with a transfer to" the Design, Development, and Manufacturing Division ("downgrade and transfer to the Design, Development, and Manufacturing Division") effective June 2010. *Doc. 63-3* ¶ 40;

*doc. 61* ¶ 31.  But June 2010 came and went without the downgrade and transfer to the Design, Development, and Manufacturing Division taking place, and on August 2, 2010, "Hoffman rescinded his offer to take [Rajendran] into his department[,] . . . stopping the demotion process[.]"[13] *Doc. 63-3* ¶ 44. Accordingly, Rajendran remained in his GS-9 mechanical engineer position in the Maintenance Engineering Division.

### E.  Training.

And so Rajendran's first year and a half of employment at Tobyhanna proceeded, with continued discussions of alleged poor performance and the contemplated, although ultimately unsuccessful, downgrade and transfer to the Design, Development, and Manufacturing Division.  Throughout this time, beginning in December 2009, Rajendran began to seek various training opportunities.  But Morman denied each of Rajendran's training requests until June

---

[13] To support this statement, Rajendran cites to an email exchange between Morman and Hoffman in which Hoffman states:

> Raj[endran] is no longer required to support any of the programs in [the Design, Development, and Manufacturing Division].  One of my engineering students had to re-model all of the piece parts that Raj[endran] did because they were inaccurate.

*Doc. 61-3* at 160.  Furthermore, Rajendran was later demoted to a GS-7 level within the Maintenance Engineering Division. *Doc. 61-9* at 2.  Liberally construing the evidence in Rajendran's favor, we find this sufficient to support his statement at this stage.

2010,[14] and even when Morman approved Rajendran's requests in the summer of 2010, Rajendran was still unable to attend the trainings.  We summarize each training requested below.

"In December 2009, Rajendran requested to take a course entitled Heat and Mass Transfer." *Doc. 61* ¶ 40.  But Morman denied this request "because the engineers in his department use only basic heat transfer equations, which anyone with a Master's Degree already knows; they do not design the heat transfer devices or surfaces that would necessitate further training."[15] *Id.* ¶ 41.  And Rajendran had a "Master's Degree in Mechanical Engineering specializing in fluid mechanics and heat transfer." *Id.* ¶ 42.

"In February 2010, Rajendran" thrice "requested to take an online training course entitled Program Management Tools." *Doc. 61* ¶ 44, 47.  Morman denied Rajendran's requests because of his busy work schedule at the time, recommending that Rajendran reapply a couple months later. *Id.* ¶ 45–46.  Rajendran then sought to complete the Program Management Tools "during

---

[14] It is disputed whether Rajendran was eligible for training during his probationary period which ended in March 2010. *Compare doc. 61* ¶ 39 *with doc. 63-3* ¶¶ 1, 2, 31.

[15] Although Rajendran writes in his counter statement of facts that his "tasks included drawing creation when design did not exist, even though it is not generally done by engineers[,]" he fails to cite to evidence that supports that assertion. *Doc. 63-3* ¶ 32 (citing *doc. 61-3* at 124–27).

personal off-duty time after hours or on weekends." *Doc. 61*¶ 52; *Doc. 63-3* ¶ 35.

Morman also denied this request to avoid "paying him compensatory time and . . .

incurr[ing] unnecessary cost for Tobyhanna." *Doc. 61* ¶ 53.  "Around the same

timeframe," however, Morman approved other employees' requests for training

during non-duty hours "assumingly paying overtime." *Doc. 63-3* ¶¶ 38, 74.

Many of Rajendran's requested trainings were related to Pro/Engineer

("Pro/E"), "a drafting software program." *Id.* ¶ 35.  Although "[e]mployees in

Rajendran's division did not do much drafting[,]" (*doc. 61* ¶ 36), Rajendran was

required to "create and check in Pro/E drawings every day" (*doc. 63-3* ¶ 22).

"Rajendran was already proficient in P[ro]/E before he started at Tobyhanna, as he

indicated on his resume." *Doc. 61* ¶ 37; *doc. 63-3* ¶ 15.  In February 2010,

"Rajendran requested to attend a Pro/E[ ] Data Management class." *Doc. 61* ¶ 49.

Morman denied this request, again citing Rajendran's busy schedule at the time. *Id.*

¶ 50.  Rajendran requested to take another Pro/E training in April 2010, which

Morman approved, but Tobyhanna's training department rejected the request

because it was not submitted 14 days in advance.[16] *Doc. 61* ¶¶ 54, 55.

In June 2010, Rajendran requested to attend another Pro/E training, this time

in Michigan. *Id.* ¶ 56.  Although Morman initially agreed to this request, when he

---

[16] Per Rajendran, the Training Department did not require others to apply for
training more than 14 days in advance of the training, however. *Doc. 63-3* ¶ 75.

discovered that Rajendran would not be combining this training with one of his
visits home to Michigan and instead "would be asking Tobyhanna to fund the trip,"
Morman denied the request and suggested Rajendran enroll for the training at a
location closer to Tobyhanna. *Id.* ¶¶ 57, 58.  Accordingly, Morman approved
Rajendran's request to attend the same training to begin on a Monday in July 2010
in Pittsburgh. *Id.* ¶¶ 59–60.  To travel to the training, Rajendran was expected to
use a car rental reserved by a Tobyhanna travel agent. *Id.* ¶¶ 61–62.  Rajendran
attempted to pick up the rental car the Thursday before the training was set to start,
"so he could use it for personal reasons over the weekend." *Id.* ¶ 61.  Although
Rajendran intended to "bear the expense for his personal use" (*doc. 63-3* ¶ 91),
Rajendran did not have a credit card to obtain the car rental early and Morman did
not offer him a cash advance option. *Doc. 61* ¶ 11, 53, 62–64; *Doc. 63-3* ¶ 11, 52,
91.  The Secretary states that Rajendran "was ultimately unable to pick up his
rental car because of his not having a credit card" (*doc. 61* ¶ 63), but Rajendran
states that "the agent was able to process the reservation" (*doc. 63-3* ¶ 52).
Regardless, Rajendran did not get the rental car and canceled the training at
Morman's request. *Doc. 61* ¶ 64; *doc. 63-3* ¶¶ 11, 53.

"On August 25, 2010, Morman arranged for Rajendran to attend [Pro/E]
training in Wayne, Pennsylvania beginning Monday, August 30" ("August 2010
Pro/E Training"). *Doc. 61* ¶ 72.  "At first, Morman tried to accommodate

Rajendran's plan to spend the weekend prior in Michigan with his family, but Morman could not figure this out so he deferred to the arrangements made by the travel department." *Id.* ¶ 73. The travel department arranged for Rajendran "to pick up a rental car from Enterprise Rent-A-Car a day or two before the training (meaning Saturday or Sunday)" at an Enterprise office in Mt. Pocono or at an airport.[17] Rajendran chose one of these options[18] "and the final reservation was made accordingly." *Id.* ¶ 75.

Prior to picking up the car, however, Rajendran contacted Enterprise and the agent did not find a car reserved for Rajendran in the Enterprise database.[19] *Doc. 63-3* ¶ 90. Rajendran thus found it "impossible" to attend the August 2010 Pro/E Training, so he did not attend the training." *Id.* ¶ 50; *Doc 61* ¶ 81. Rajendran

---

[17] Although the Secretary states that pick up could have occurred at the Scranton/Wilkes Barre Airport (*doc. 61* ¶ 74), Rajendran states that he was instructed to pick up at the Mount Pocono Airport (*doc. 63-3* ¶ 90). The evidence the parties point to conflicts as to this point.

[18] Although the Secretary states, "Rajendran chose to pick up on Sunday at Mt. Pocono," he cites evidence that is conflicting whether Rajendran chose to pick up at an office in Mount Pocono or at the Mount Pocono airport. *Doc. 61* ¶ 75.

[19] According to the Secretary, however, Rajendran attempted to pick up the rental early, on Thursday, "so he could use it to drive home at Tobyhanna's expense[,]" and when he was unable to do so he canceled the rental car reservation. *Doc. 61* ¶¶ 77, 78. Rajendran then, per the Secretary, "attempted to obtain a rental in Michigan," on Sunday, "but he failed because Tobyhanna had never authorized such a change." *Id.* ¶ 80. Because this fact is disputed, we defer to Rajendran's version of events.

called Morman to inform him of his decision not to attend the training on his desk phone, rather than on his work cell phone. *Id.* ¶ 82.  Accordingly, "Morman did not find out what happened until Monday" and "[b]ecause the training was not cancelled in time, Tobyhanna was required to pay $2,250 for it."[20] *Id.* ¶ 83.

### F.  Absence from Work on August 23, 2010.

Just two days before Morman scheduled Rajendran to attend the August 2010 Pro/E Training, "[o]n August 23, 2010, Rajendran was scheduled to begin working at 7[:00] [a.m.]." *Doc. 61* ¶ 65.  Rajendran did not sign in at that time, however. *Id.* ¶ 65.  When at work, "[Rajendran] was required to NOT [sic] be in the seat but be in [sic] the shop floor which is 1 square mile area[,]" and in the past "[Rajendran] had been reprimanded for being in his seat[.]" *Doc. 63-3* ¶ 82. Regardless, Morman looked for Rajendran that morning and was unable to find him, despite "asking his co-workers, calling him on the phone, and finally calling his wife." *Id.* ¶ 66.

"Around noon, Morman learned that Rajendran had indeed been present at Tobyhanna" that morning. *Id.* ¶ 67.  Rajendran had been "assisting his son in an [Equal Employment Opportunity ("EEO")] meeting that had been scheduled to

---

[20] Rajendran states that "the Agency did not lose this amount[.]" *Doc. 63-3* ¶ 92.  He fails to cite to evidence that supports this statement, however.

start at 8:30 a.m." *Id.*  Rajendran insists he gave "prior notice of the need to miss work to attend his son's EEO[ ] session" (*doc. 63-3* ¶ 79), but he cites only an unsigned "response" to a memorandum which states that "I informed you about the upcoming EEO meeting with my son in about 2 weeks" (*doc. 61-3* at 69). Rajendran does not dispute that he failed to sign in. *Doc. 63-3* ¶ 79 (citing *doc. 61-3* at 69) ("si[gn]ing-in in the morning as well as calling my family to inform my safe arrival after my night journey (from Michigan) slipped my mind").

When others in the past had forgotten to sign in, Morman had "walked up to them and reminded them to sign in, assuming they were at their seat starting at 7[:00 a.m.] and made no attempt to find where they had been from 7[:00 a.m.]" *Doc. 63-3* ¶ 81; *doc. 61* ¶ 70.  But "the issue with Rajendran was . . . not mere failure to physically sign in, but that his whereabouts were unknown." *Id.* ¶ 71. Morman "gave [Rajendran] an opportunity to explain where he was from 7[:00 a.m.] [to] 8:30 a[.]m[.]" but was unable to later remember Rajendran's response. *Doc. 63-3* ¶¶ 83, 86, 87, 124.  Nevertheless, "[a]lthough he missed several hours of his shift, Rajendran was designated as Absent without Leave [("AWOL")] for that day only between 7[:00 a.m.] and 8:30 [a.m.], the time he was supposed to begin work and the time the [EEO] meeting was scheduled to start." *Doc. 61* ¶ 69.

### G.  Suspension.[21]

In October 2010, "Rajendran was issued a notice of three-day suspension" drafted by Tobyhanna's Human Resources Department. *Doc. 61* ¶¶ 84, 86.  This suspension was based on both Rajendran's failure to attend the August 2010 Pro/E Training and the AWOL.[22] *Id.* ¶ 84; *doc. 63-3* ¶¶ 51, 78.  The suspension, however, was never placed in Rajendran's file. *Doc. 61* ¶ 89.

In choosing the penalty of a three-day suspension, Morman and Viola consulted with Tobyhanna's Management-Employee Relations department. *Doc. 61* ¶ 87.  Morman and Viola also consulted a "table of penalties" in making this decision. *Id.* ¶ 88.  Rajendran points out that this table of penalties "does not include failing to sign or inability to attend training beyond employee's control." *Doc. 63-3* ¶ 78.  The table of penalties does, however, include "[a]ny absence from the regularly scheduled tour of duty which has not been authorized and/or for which pay must be denied (AWOL) or any absence from management directed

---

[21] Rajendran appears to compare his penalty with that of another employee, a Mr. Larry Frable ("Frable"), whose second line supervisor was also Viola. *See doc. 63-3* ¶¶ 16–20.  Rajendran states that Frable "swore at a female employee using obscene language" and "kicked her in the buttocks . . . [on] two different occasions[.]" *Id.* ¶ 16–17.  Frable received "one day 'administrative' suspension." *Id.* ¶ 18.

[22] Rajendran disputes the characterization of these events. *Doc. 63-3* ¶ 77 ("Plaintiff stated he is ONLY pleading guilty for forgetting to sign in and refuting all the other complaints and Plaintiff's these [sic] responses to the complaints was [sic] totally disregarded.").

additional hours of duty (Unauthorized Absence)" and "[f]ailure to follow established leave procedures" ("attendance related offenses"). *Doc. 61-3* at 692. The table of penalties provides for a range of penalties for each offense. *Id.* For the first attendance related offense, the table of penalties provides a range of penalties from written reprimand to five-day suspension. *Id.* The table of penalties also includes offenses of "[i]dleness or failure to work on assigned duties" and "[d]elay in carrying out or failure to carry out instructions within the time required" ("loafing related offenses"). *Id.* The table of penalties provides a range of penalties from written reprimand to three-day suspension for loafing related offenses. *Id.* Accordingly, the three-day suspension Rajendran received "was within the prescribed range." *Doc. 61* ¶ 88.

### H.  Demotion.

Despite his earlier agreement to be downgraded and transferred to the Design, Development, and Manufacturing Division, when June 2010 came and went Rajendran remained classified as a GS-9 working in the Maintenance Engineering Division and reporting to Morman.  Rajendran thus remained so

employed on September 9, 2010,[23] when Morman emailed a Mr. George Brady

stating:

> I spoke to [Management-Employee Relations] today and threw
> out the suggestion to keep Raj[endran] in the eng[inee]r slot.
> They did NOT recommend this. . . . Thus, we need to keep the
> GS-07 going.  Can you please follow up with RM to get this
> moving? I really need this to happen ASAP.

*Doc. 61-3* at 215.[24]  The Agency then moved a GS-7 position from the Design,

Development, and Manufacturing Division to the Maintenance Engineering

Division, in which it then placed Rajendran. *Doc. 63-3* ¶ 47.  Simultaneously, the

Agency promoted a GS-7 engineer[25] to Rajendran's former GS-9 engineer position

in the Maintenance Engineering Division. *Id.* ¶ 48.  On October 24, 2010,

Rajendran's position was changed from a Mechanical Engineer, level GS-9, in the

Maintenance Engineering Division, to a Engineering Technician (Mechanical),

---

[23] Rajendran states that before this, on June 17, 2010, "Demotion intent was emailed to Plaintiff" and "expectations [were] reviewed on June 18[ ], 2010. Working on opening a slot to place in the current dep[artmen]t[.]" *Doc. 63-3* ¶ 122. He does not cite evidence supporting this assertion, however.

[24] Rajendran cites to this portion of the record but mischaracterizes Morman's statements: "Mr. Morman sent [an] email to Mr. George Brady indicating that against the recommendation of [management-employee relations], he discarded the idea of keeping plaintiff as an engineer." *Doc. 63-3* ¶ 46.  This is directly contrary to the evidence to which Rajendran cites. *Doc. 61-3* at 214–15.

[25] Rajendran states that this engineer was a Caucasian and was transferred from the Design, Development, and Manufacturing Division (*doc. 63-3* ¶ 48), but the evidence to which he cites does not support this assertion (*doc. 61-3* at 214–15).

level GS-7, still in the Maintenance Engineering Division. *Doc. 61-9* at 2; *see also doc. 63-3* ¶ 49.


### I. EEO Proceeding and OFO Order.

"On July 20, 2010, Rajendran initiated contact with the Army's [EEO] Office." *Doc. 61* ¶ 90. Approximately one month later, on August 18, 2010, "Rajendran filed a formal EEO complaint alleging discrimination on the basis of his national origin (Asian/Indian)" (*doc. 61* ¶ 91) bringing "claims related to his training and proposed demotion" (*doc. 63-3* ¶ 45).

"Initially, Rajendran's EEO complaint resulted in a settlement agreement, which was executed on January 21, 2011." *Doc. 61* ¶ 92. But in November 2011, Rajendran filed a formal complaint with the Agency alleging that the Agency breached the settlement agreement by failing to "pay him for the lost wages incurred from [his] 3-day suspension[.]" *Doc. 61-10* at 3. Although the Agency found that they had not breached the settlement agreement, Rajendran appealed that decision to the OFO. *Id.* And, on June 25, 2012, the OFO found that the Agency had breached the settlement agreement. *Id.* at 5. Accordingly, the OFO Ordered "[t]he Agency . . . to notify [Rajendran] of his option to either return to the status quo prior to the signing of the settlement agreement or to obtain specific performance of . . . the agreement concerning lost wages." *Id.* at 5; *Doc. 61* ¶ 93.

Rajendran chose to return to the status quo prior to the signing of the agreement. *See id.* ¶ 94.  Thus Rajendran was required to "return any benefit received pursuant to the agreement[,]" and the Agency was required to reinstate Rajendran's EEO complaint and employment "at the point processing [of the EEO complaint] ceased" due to settlement. *Doc. 61-10* at 5.  The Army placed Rajendran in a position in the Design, Development, and Manufacturing Division. *Doc. 61* ¶ 94.  Rajendran resigned from this position with a letter explaining that his resignation was due to the position not being a status quo position. *See doc. 63-1* ¶ 65; *doc. 61* ¶ 94.

## V.  Discussion.

Although summary judgment typically is warranted only after adequate time for discovery, *see Doe v. Abington Friends School*, 480 F.3d 252, 257 (3d Cir. 2007), a plaintiff seeking additional discovery prior to summary judgment  must comply with Fed. R. Civ. P. 56(f) by "identifying 'with specificity what particular information is sought; how, if uncovered, it would preclude summary judgment; and why it has not previously been obtained.'" *Bradley v. United States*, 299 F.3d 197, 206–07 (3d Cir. 2002) (quoting *St. Sturan v. Virgin Islands Daily News, Inc.*, 21 F.3d 1309, 1314 (3d Cir. 1994)).  Here, although Rajendran cites *Doe v. Abington*, in his brief in opposition for the premise that discovery is required prior

27

to a decision on summary judgment, he has not filed a motion seeking discovery,

nor has he complied with Rule 56(f).  Accordingly, we proceed to the merits of the

motion for summary judgment.


### A.  Title VII Claims.

Rajendran claims that the Agency discriminated against him because of his

national origin and retaliated against him for reporting that discrimination in

violation of Title VII.  Specifically, he brings seven claims under Title VII:

(1)  The training discrimination claim;
(2)  The suspension discrimination claim;
(3)  The demotion discrimination claim;
(4)  The training retaliation claim;
(5)  The suspension retaliation claim;
(6)  The demotion retaliation claim; and
(7)  The status quo retaliation claim.

*See docs. 17, 49.*

"In 1972, Congress extended Title VII's protection to federal employees."

*Francis v. Mineta*, 505 F.3d 266, 271 (3d Cir. 2007).  The federal-sector provision

of Title VII provides that "[a]ll personnel actions affecting employees or applicants

for employment" in specified federal departments and agencies "shall be made free

from any discrimination based on race, color, religion, sex, or national origin." 42

U.S.C. § 2000e-16(a).

Under Title VII, a plaintiff may generally pursue a disparate treatment discrimination claim under either a pretext theory or a mixed-motive theory. *Makky v. Chertoff*, 541 F.3d 205, 213 (3d Cir. 2008). "Generally speaking, in a 'mixed-motive' case a plaintiff claims that an employment decision was based on both legitimate and illegitimate reasons." *Connelly v. Lane Const. Corp.*, 809 F.3d 780, 787 (3d Cir. 2016). "Such cases are in contrast to so-called 'pretext' cases in which a plaintiff claims that an employer's stated justification for an employment decision is false." *Id.* Here, both parties analyze this case as a pretext case.

Under the pretext theory of discrimination, the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), applies.[26]

---

[26] In 2021, the Eleventh Circuit suggested that the *McDonnell Douglas* framework does not apply to a claim under the federal-sector provision of Title VII. *Babb v. Sec'y, Dep't of Veterans Affs.*, 992 F.3d 1193, 1205 (11th Cir. 2021). That suggestion is based on the Supreme Court's recent holding construing a similarly worded federal-sector provision of the Age Discrimination in Employment Act. *Id.* (citing *Babb v. Wilkie* ("*Babb*"), 589 U.S. 399 (2020)). And on December 7, 2023, in an unreported opinion, the Third Circuit similarly held that analysis of the federal-sector provision of Title VII is distinct from that of the private-sector provisions. *See Kocher v. Secretary, United States Department of Veterans Affairs*, No. 23-1108, 2023 WL 8469762, *1 (3d Cir. Dec. 7, 2023) ("While the District improperly applied the private-sector antidiscrimination and antiretaliation standards to [the plaintiff], a federal employee, we will affirm the District Court"). The Third Circuit has not been consistent on this point, however. *See Baum v. Commissioner of Social Security*, No. 21-1031, 2022 WL 16916348, *2–*3 (3d Cir. Nov. 14, 2022) (applying the *McDonnell Douglas* framework to a federal-sector case); *Patterson v. Commissioner of Social Security*, 834 Fed. Appx. 737, 738–39 (3d. Cir. Jan. 28, 2021) (holding that the plaintiff does not meet the lower causation standard prescribed by the Supreme Court for ADEA cases in *Babb* and analyzing the case according to *McDonnell Douglas*). And since the

That burden-shifting analysis has three stages. *Jones v. Sch. Dist. of Philadelphia*, 198 F.3d 403, 410 (3d Cir. 1999).  "First, the plaintiff must establish a prima facie case of discrimination." *Id.*  If the plaintiff establishes a prima facie case, "the burden of production shifts to [the defendant] to provide a legitimate, non-discriminatory reason for its actions." *Fowler v. AT&T, Inc.*, No. 20-2247, 2021 WL 5540844, at *4 (3d Cir. Nov. 26, 2021).  "If the defendant's evidence creates a genuine issue of fact, the presumption of discrimination drops from the case." *Stewart v. Rutgers, The State Univ.*, 120 F.3d 426, 432 (3d Cir. 1997).  And "the plaintiff then must have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Jones*, 198 F.3d at 410.  "Although the burden of production of evidence shifts back and forth, the plaintiff has the ultimate burden of persuasion at all times." *Daniels v. Sch. Dist. of Philadelphia*, 776 F.3d 181, 193 (3d Cir. 2015).

---

Eleventh Circuit decision in *Babb*, other district courts in the Third Circuit have applied the *McDonnell Douglas* framework. *See Araoye v. Vilsack*, No. 23-1331, 2024 WL 422076, *5 (E.D. Pa. Feb. 5, 2024); *Larocca v. Garland*, No. 22-2806, 2023 WL 6520489, *7 (E.D. Pa. Oct. 5, 2023); *Minor v. McDonough*, 2:22-cv-0304, 2023 WL 5406628, *9 (W.D. Pa. Aug. 22, 2023); *Hooks v. VA Pittsburgh Healthcare System*, No. 2:21-cv-0321, 2023 WL 3225398, *5 (W.D. Pa. May 3, 2023).  And here both parties proceed under the *McDonnell Douglas* framework, and they have not briefed whether such a theory is still viable in a federal-sector Title VII case.  Thus, we proceed with this case under the *McDonnell Douglas* framework.

The same analysis applies to retaliation such that, "[a]fter establishing a prima facie case of retaliation, the burden shifts to the employer to provide a legitimate non-retaliatory reason for its conduct" and, "[i]f it does so, the burden shifts back to the plaintiff" to show that such non-retaliatory reason was pretextual. *Carvalho-Grevious v. Delaware State University*, 851 F.3d 249, 257 (3d Cir. 2017). "The onus is on the plaintiff to establish causation at two stages of the case: initially, to demonstrate a causal connection as part of the prima facie case, and at the final stage of the *McDonnell Douglas* framework to satisfy her ultimate burden of persuasion by proving pretext." *Id.*

Accordingly, we first analyze whether Rajendran has stated prima facie cases of discrimination and retaliation. Then, for those claims for which Rajendran has stated a prima facie case, we proceed to the burden shifting analysis which is common to both discrimination and retaliation claims.

### 1. Prima Facie Case of Discrimination.

Rajendran brings claims of discrimination based on (1) denial of training opportunities, (2) his suspension, and (3) his demotion. To establish a prima facie case of discrimination under the pretext theory, a plaintiff may "present[ ] direct evidence of intentional discrimination by the defendant." *Collins v. Kimberly-Clark Pennsylvania, LLC*, 247 F. Supp. 3d 571, 589 (E.D. Pa. 2017) (citing *Trans*

31

*World Airlines, Inc. v. Thurston*, 469 U.S. 111, 121, 105 S.Ct. 613, 83 L.Ed.2d 523

(1985)).  Alternatively, the plaintiff can establish her prima facie case with

circumstantial evidence by showing that "(1) [ ]he is a member of a protected class,

(2) [ ]he was qualified for the position . . . , (3) [ ]he suffered an adverse

employment action, and (4) the action occurred under circumstances that could

give rise to an inference of intentional discrimination." *Mandel v. M & Q*

*Packaging Corp.*, 706 F.3d 157, 169 (3d Cir. 2013) (quoting *Makky v. Chertoff*,

541 F.3d 205, 214 (3d Cir. 2008)) (internal quotation marks omitted).  The parties

do not dispute that Rajendran is a member of a protected class.  The parties do

dispute, however, each other element.


### i. Qualified for the Position.

The Secretary points to Third Circuit precedent that leaves open the

possibility that "there could be situations where subjective qualifications could be

considered as part of the prima facie case[.]" *Doc. 62* at 14 (quoting *Fowle v. C &*

*C Cola, a Div. of ITT-Cont'l Baking Co.*, 868 F.2d 59, 64–65 (3d Cir. 1989)).

Inviting us to consider subjective qualifications at the prima facie stage of analysis,

the Secretary argues that Rajendran was not qualified for his position because "a

mountain of testimony shows that he performed remarkably poorly from the very

beginning of his tenure at Tobyhanna and failed to improve throughout his first

year[.]" *Doc. 62* at 14.  Rajendran, however, states that he met the objective

qualifications for his position and Morman "admitted that [Rajendran] was

'proficient in [Pro/E], proficient in those areas of mechanical design, that type of

thing[.]" *Doc. 63* at 11–12 (citing *doc. 63-3* ¶¶ 12, 13, 15).  The Secretary

characterizers this counter-argument as "Rajendran merely shrug[ging] off the

plethora of real-time negative feedback from his clients[.]" *Doc. 64* at 4.

Although the Third Circuit declined to establish a "blanket rule about" when

"subjective criteria" can enter into the *McDonnell Douglas* analysis in *Fowle*, 868

F.2d at 64–65, the Third Circuit has also held that "while objective qualifications

should be considered in evaluating the plaintiff's *prima facie* case, the question of

whether an employee possesses a subjective quality . . . is better left to the later

stage of the *McDonnell Douglas* analysis." *Weldon v. Kraft, Inc.*, 896 F.2d 793,

798–99 (3d Cir. 1990); *see also Fowler v. AT & T Inc.*, 19 F.4th 292, 303 (3d Cir.

2021) ("At the *prima facie* stage, this requires an inquiry into whether she

possessed the minimal objective qualifications for the position.") (citing *Fowle*,

868 F.2d at 64–65).  And "subjective evaluations 'are more susceptible of abuse

and more likely to mask pretext.'" *Id.* (quoting *Fowle*, 868 F.2d at 64–65).  Thus,

"[i]n Title VII cases involving a dispute over 'subjective' qualifications, [the Third

Circuit has] recognized that the qualification issue should often be resolved in the

second and third stages of the *McDonnell Douglas* . . . analysis, to avoid putting

too onerous a burden on the plaintiff in establishing a prima facie case, but [it has] refused to adopt a blanket rule." *Ezold v. Wolf, Block, Schorr and Solis-Cohen*, 983 F.2d 509, 523 (3d Cir. 1992).  Put another way, "to deny the plaintiff an opportunity to move beyond the initial stage of establishing a *prima facie* case because he has failed to introduce evidence showing he possesses certain subjective qualities would improperly prevent the court from examining the criteria to determine whether their use was mere pretext." *Weldon*, 896 F.2d at 798–99.

Further, were we to consider subjective qualifications at this juncture, here, Rajendran's subjective qualifications for the job are disputed.  The Secretary points to evidence of bad feedback on his performance, *see doc. 61* ¶¶ 8–18, 22–25, and Rajendran points to his excellent year-end review and continues to dispute the reports of his poor performance, *see doc. 63-3* ¶¶ 73, 89, 109.  Although the Secretary attempts to explain the excellent year-end review as Morman "giv[ing] Rajendran 'the benefit of the doubt[,]'" *doc. 61* ¶ 20, Rajendran describes it differently, *doc. 63-3* ¶ 109.  Thus, we find that for purposes of this summary judgment motion, Rajendran has satisfied this element of his prima facie case for all three discrimination claims.

### ii. Adverse Employment Action.

For purposes of a prima facie case of Title VII discrimination, "[t]he Supreme Court defines an adverse employment action as a 'significant change in employment status, such as hiring, firing, failing to promote, reassignment, or a decision causing a significant change in benefits.'" *O'Neal v. Brownlee*, No. Civ.A. 03-5535, 2004 WL 2827052, *5 (E.D. Pa. Dec. 9, 2004) (quoting *Burlington Indus. Inc. v. Ellerth*, 524 U.S. 742, 761 (1998)).  The parties do not dispute whether Rajendran's demotion and suspension were adverse employment actions.  The parties do dispute, however, whether denying Rajendran training— either outright or through allegedly making the training difficult to attend—is an adverse employment action for purposes of a prima facie case of discrimination.

The Secretary argues that denial of training is not an adverse employment action where, as here, the plaintiff did not need any training to perform his job and "did not suffer any adverse effect from not attending his requested trainings[.]" *Doc. 62* at 19, 20.  Rajendran counters that, because his training requests were denied, he was unable to meet the training requirements. *Doc. 63* at 15.  But he does not cite to his counter-statement of material facts or the record to support this statement so we consider it no further. *See id.*

Rajendran also argues that "[w]ithout training, [he] needed longer time to complete assignments, leading to complaints from customers and being written

up." *Id.* at 15–16.  But "'[a]n employer's denial of a training request, without something more, is not itself an adverse employment action.'" *Cross v. Postmaster General of United States*, 696 Fed. Appx. 92, 95 (3d Cir. 2017) (quoting *Clegg v. Ark. Dep't of Corr.*, 496 F.3d 922, 928 (8th Cir. 2007)) (alteration in original). And "[t]he denial of an opportunity to become marginally more efficient in the execution of [his] duties does not constitute an adverse employment action, particularly where no evidence in the record suggests that any conditions or privileges of [his] employment were affected as a result." *Ford v. County of Hudson*, 729 Fed. Appx. 188, 195 (3d Cir. 2018) (citing *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006); *see also Pagan v. Gonzalez*, 430 Fed. Appx. 170, 172 (3d Cir. 2011) ("the denial or training opportunities does not constitute an adverse employment action because there was no evidence that the Appellant's work suffered or that her advancement or earning potential was affected").

Here, Rajendran fails to point to any evidence that his employment was adversely affected by his failure to obtain the requested and scheduled trainings. Although his work may have taken longer without the training, he does not point to how this has resulted in an effect on the conditions and privileges of his

employment.[27] *See Ford*, 729 Fed. Appx. at 195.  Nor does he distinguish the desired training from an "opportunity to become marginally more efficient in the execution of [his] duties." *Id.*  Accordingly, Rajendran has failed to set forth a prima facie case of discrimination for his training discrimination claim, and we will grant the Secretary's motion for summary judgment on the training discrimination claim.

### iii. Circumstances that Could Give Rise to an Inference of Intentional Discrimination.

At this juncture, two of Rajendran's discrimination claims remain: his claims related to his suspension and his demotion.  For purposes of summary judgment, Rajendran has satisfied the first three elements of a prima facie case of discrimination.  As discussed above, the fourth element of a prima facie case of discrimination is that "the adverse employment action occurred under

---

[27] Although Rajendran missing the August 2010 Pro/E Training was cited in Rajendran's suspension decision, we find that the events surrounding the August 2010 Pro/E Training, like all the other training denials, is not an adverse action. *Cf O'Neal v. Brownlee*, No. Civ. A. 03-5535, 2004 WL 2827052, *5 (E.D. Pa. Dec. 9, 2004) ("Plaintiff's decision not to attend the Florida training after the rental car was not authorized did not result in a significant change in his employment status. He was not fired or demoted because he refused to attend the training without a rental car.  Plaintiff's allegation that Cassady told him he could not have a rental car to 'drive all over Florida.' [sic] is also insufficient to constitute an adverse employment action.").  The suspension was a result of Rajendran's missing the training without notice *and* his period of AWOL.  Accordingly, we analyze the suspension separately below.

circumstances that could give rise to an inference of intentional discrimination." *Greene v. Virgin Islands Water & Power Authority*, 557 Fed. Appx. 189, 195 (3d Cir. 2014). And "[t]o establish [this] element, a plaintiff may either: (1) introduce evidence of comparators (i.e., similarly situated employees who (a) were not members of the same protected class and (b) were treated more favorably under similar circumstances); or (2) rely on circumstantial evidence that otherwise shows a causal nexus between his membership in a protected class and the adverse employment action." *Id.* The Secretary argues that Rajendran fails to point to any viable comparators (*doc. 62* at 15–17), which Rajendran disputes (*doc. 63* at 8–9). We need not decide whether Rajendran's proffered comparators are similarly situated because we find Rajendran has proffered the "circumstantial evidence that otherwise shows a causal nexus between his membership in a protected class and the adverse employment action[s]" necessary to find that he has satisfied the fourth element of a prima facie case of discrimination at the summary judgment stage. *See Greene*, 557 Fed. Appx. at 195.

In her brief in support, the Secretary argues that "Rajendran does not point to—or even allege—animus that would otherwise warrant an inference of discrimination." *Doc. 62* at 17. Oddly, the Secretary draws our attention to Rajendran's amended complaint, stating it "does not include a single allegation about his superiors looking down on him for coming from India." *Id.* at 18. Be that

as it may, Rajendran need not depend on the amended complaint at this summary judgment stage.  Instead, he must, as he does, rely on the record.

Here, Rajendran testified in a previous proceeding that he heard Morman's derogatory remarks, which allegedly occurred in July 2009, as summarized in the Statement of Material Facts section of this Opinion. *See doc. 61-13* at 22–23, 38–40, 60–61 (testimony in the EEOC hearing that took place on February 22, 2016). The Secretary admits in her reply brief that "Rajendran alleged at [a] hearing in 2016 that Morman made some offensive or prejudicial remarks about Indian people[.]" *Doc. 64* at 5.  But the Secretary then cites other parts of the record in which Rajendran did not make these allegations and invites us to "reject" "his belated and dubious injection of racial antipathy[.]" *Id.* at 5–6.  This we cannot do. Although Rajendran's contradicting statements may be relevant at trial, we cannot make a credibility determination at this juncture. *Siegel Transfer, Inc. v. Carrier Exp., Inc.*, 54 F.3d 1125, 1127 (3d Cir. 1995) ("In considering a motion for summary judgment, a court does not resolve factual disputes or make credibility determinations, and must view facts and inferences in the light most favorable to the party opposing the motion.").  Thus, for purposes of this motion, we will consider Morman's derogatory remarks.

Because the Secretary does not engage with Rajendran's testimony that Morman made derogatory comments, and instead only continues to insist that he

39

did not do so, she does not put forth argument that there is no causal nexus between Morman's derogatory remarks and Rajendran's suspension and demotion. Thus, we find that there is a genuine dispute whether Morman made the above-summarized derogatory statements. This dispute is material to whether Rajendran meets the fourth element of a prima facie case of discrimination for his suspension and demotion discrimination claims.

Given this dispute, there is sufficient evidence from which a reasonable fact finder could conclude that the circumstances surrounding Rajendran's suspension and demotion could give rise to an inference of intentional discrimination. The burden now shifts to the defendant. As discussed above, both discrimination and retaliation claims that state a prima facie case then require the defendant to meet her burden to produce a non-discriminatory, non-retaliatory reason for the actions. Accordingly, we will analyze whether the Secretary meets her burden after we discuss which of Rajendran's retaliation claims state a prima facie case.

## 2. Prima Facie Case of Retaliation.

Rajendran brings claims of retaliation based on (1) denial of training opportunities, (2) his suspension, (3) his demotion, and (4) the Agency's failure to reinstate Rajendran in a status quo position. *Doc. 17*. Because neither party addresses Rajendran's status quo retaliation claim (*see docs. 62, 63, 64*), neither

will we and this claim will survive the motion for summary judgment.  The parties also do not dispute whether Rajendran has set forth a prima facie case of retaliation related to his suspension.  We will thus pick up the analysis of Rajendran's suspension retaliation claim at the burden shifting phase of analysis.

"To state a prima facie case of retaliation, a plaintiff must show that (1) [ ]he engaged in a protected activity, (2) [ ]he suffered an adverse employment action, and (3) there was a causal connection between the participation in the protected activity and the adverse action." *Carvalho-Grevious*, 851 F.3d 249, 257 (citing *Moore v. City of Philadelphia*, 461 F.3d 331, 340–41 (3d Cir. 2006)).  "Ultimately, a plaintiff bringing a Title VII retaliation claim must be able to show that his participation in protected activity was the but-for cause of any alleged adverse employment action that he suffered." *Cooper v. Pennsylvania Human Relations Commission*, 578 F. Supp. 3d 649 (M.D. Pa. 2022) (citing *Univ. of Tex. Southwestern Med. Ctr. v. Nassar*, 570 U.S. 338, 133 S.Ct. 2517, 186 L.Ed.2d 503 (2013)).

Here, it is undisputed that Rajendran engaged in a protected activity for the first time on July 20, 2010, by initiating contact with the Army's EEO Office. *See doc. 61* ¶ 90.  Regarding Rajendran's training and demotion retaliation claims, the Secretary, in her brief in support, argues only that Rajendran's demotion and the denial of his training requests occurred prior to July 20, 2010, and thus cannot have

been done in retaliation for the protected activity.  We presume this argument goes to the third element of a prima facie case of retaliation, that is, the "causal connection between the participation in the protected activity and the adverse action." *Carvalho-Grevious*, 851 F.3d 249, 257.

The Secretary argues that all training denials occurred before July 20, 2010, and, accordingly, Rajendran cannot state a prima facie case of retaliation on these claims. *Doc. 62* at 22.  Rajendran agrees that he was not denied training after July 20, 2010, and, in fact, he states that he does not intend to bring retaliation claims related to the denial of training. *Doc. 63* at 18.  But Rajendran points out that his claims revolving around the August 2010 Pro/E Training occurred *after* his protected activity on July 20, 2010. *Id.*  In her reply,[28] the Secretary counter argues that missing the training is not an adverse action, citing to her previous argument that the training denials were not "adverse actions" as the term is defined for

_____

[28] In her reply brief, the Secretary also states "Rajendran does not mention training at all in his amended complaint under 'Count II – Retaliation, and the only claim of retaliation he ever made in his EEO complaint below was in connection with his suspension.'" *Doc. 64* at 7 (internal citations omitted).  Regardless, because the Secretary failed to raise this before a reply brief, we will not further address it. *See United States v. Pelullo*, 399 F.3d 197, 222 (3d Cir. 2005) ("It is well settled that an appellant's failure to identify or argue an issue in his opening brief constitutes waiver of that issue on appeal."); *see also Sloan v. Murray*, No. 3:CV-11-0994, 2017 WL 3495190, at *5 n.4 (M.D. Pa. Aug. 10, 2017) ("Like an issue raised for the first time in an appellate brief, issues raised for the first time in a reply brief supporting [a pretrial motion] are deemed waived because the opposing party typically does not have the opportunity to respond.").

claims of discrimination. *Doc. 64* at 7–8.  But to demonstrate an adverse employment action in a retaliation claim, "a plaintiff must show that a reasonable employee would have found the alleged retaliatory actions 'materially adverse' in that they '"well might have dissuaded a reasonable worker from making or supporting a charge of discrimination."'" *Moore v. Beers*, No. 13-6614, 2017 WL 515004, *3 (D.N.J. Feb. 8, 2017) (quoting *Moore v. City of Philadelphia*, 461 F.3d at 340–41 (itself quoting *Burlington Northern & Santa Fe Ry. Co.*, 548 U.S. at 67)).  The Secretary does not address this different standard.

The Secretary also fails to give any deference to Rajendran's counter statement of material facts, as we must do.  According to the Secretary, the Agency not only approved the training but "even arranged for his rental car before [Rajendran] cancelled the reservation as incompatible with his personal travel plans." *Doc. 64* at 8.  But Rajendran points to evidence that he was not responsible for canceling his rental car and, instead, states that the Agency failed to make the reservations. *Doc. 63-3* ¶ 90.  Because we "must view facts and inferences in the light most favorable to the party opposing the motion[,]" we must defer to Rajendran's version of events here. *Siegel Transfer, Inc.*, 54 F.3d at 1127.  And in so doing, we find that Rajendran has, for purposes of this summary judgment motion, stated a prima facie case for his claims of retaliation based on the events surrounding the August 2010 Pro/E Training.

The Secretary argues that Rajendran's demotion retaliation claim similarly suffers from a "fundamental temporal flaw." *Doc. 62* at 22. As the Secretary sees it, Rajendran accepted his downgrade in March 2010 and first initiated protected activity in July 2010, so "it is impossible for these actions to have been taken in retaliation for Rajendran's complaint and he cannot establish the second element of his prima facie case." *Id.* But Rajendran states that "[w]hen Hoffman rescinded his offer [to have Rajendran work in the Design, Development, and Manufacturing Division], [the] Army was forced to stop processing the 'request' for demotion [and] started a new demotion process in September within the [Maintenance Engineering Division], which [Rajendran] did NOT request[.]" *Doc. 63* at 20. The Secretary's reply to this argument is notably brief: "the evidence is clear and overwhelming that the process that began in March 2010 contemplated Rajendran going from a GS-9 engineer to a GS-7 technician, so he cannot *credibly* claim that when this finally occurred—through whatever route and in whatever form—it was done in reaction to his EEO activities beginning in July 2010." *Doc. 64* at 7 (emphasis added).

It is not for us to decide at this juncture whether Rajendran's claim that his demotion was done in retaliation is *credible*. Instead, we look, as we must, to the statements of material facts before us and, where they differ, we defer to Rajendran's version of facts. As discussed above, Rajendran points to evidence

44

that establishes that on March 10, 2010, he agreed to a new position at a GS-7 level in the Design, Development, and Manufacturing Division, but this new position never came to fruition. *See doc. 63-3* ¶¶ 40, 41, 44, 57, 60, 63, 99.  And Rajendran points to evidence that on September 9, 2010, Morman discussed with Management-Employee Relations and others whether Rajendran would remain in his position or be demoted to a GS-7 level and, after those September conversations, Rajendran was ultimately demoted to a GS-7 level position in the Maintenance Engineering Division. *See doc. 63-3* at 47–59; *Doc. 61-3* at 215; *Doc. 61-9* at 2.  Thus, the decision to demote Rajendran to the position in which he was ultimately placed appears to have occurred in September 2010, after Rajendran engaged in protected activity and the Secretary's argument to the contrary must fail.

Accordingly, to the extent that Rajendran brings claims for retaliation based on any training besides the August 2010 Pro/E Training, the motion for summary judgment will be granted.  But, for purposes of summary judgment, we find that Rajendran has set forth a prima facie case for his demotion retaliation claim and his training retaliation claim based on the August 2010 Pro/E Training. Accordingly, the burden now shifts to the defendant.

### 3.  August 2010 Pro/E Training Burden Shifting.

As we have found that Rajendran, for purposes of this motion for summary judgment, has established a prima facie case of retaliation based on the restrictions placed on his travel to the August 2010 Pro/E Training, the Secretary now must provide a legitimate, non-retaliatory reason for those restrictions.  An employer satisfies its burden of production by introducing evidence that would permit the conclusion that there was a nonretaliatory reason for the unfavorable employment decision. *See Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir. 1994).  "The employer need not prove that the tendered reason *actually* motivated its behavior, as throughout this burden-shifting paradigm the ultimate burden of proving intentional discrimination always rests with the plaintiff." *Id.*

Here, the Secretary explains that Morman and the travel department arranged for Rajendran to pick up a rental car to attend the training, but Rajendran never picked up the rental car. *See doc. 62*.  The Agency argues that, rather than making the training "impossible" for Rajendran to attend with "extremely stringent restrictions[,]" (*doc. 63-3* ¶ 50), it enabled Rajendran to attend the training. *See doc. 62*.  The Agency thus satisfies its burden of production by introducing evidence that it did not act in a retaliatory manner.

Now that the Agency has met its relatively light burden by articulating a legitimate reason for its action, the burden of production rebounds to the plaintiff.

46

To defeat summary judgment, the plaintiff must point to some evidence, direct or circumstantial, from which a fact finder reasonably could either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a determinative cause of the employer's action. *Daniels*, 776 F.3d at 198–99.  "To discredit the employer's proffered reason, the plaintiff cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether a discriminatory animus motivated the employer, not whether the employer is 'wise, shrewd, prudent, or competent.'" *Brewer v. Quaker State Oil Refining Corp.*, 72 F.3d 326, 331 (3d Cir. 1995) (quoting *Fuentes*, 32 F.3d at 765).   Rather, the plaintiff must demonstrate "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in the employer's proffered reasons that a reasonable fact finder could rationally find the proffered reasons unworthy of credence and infer that the employer did not act for those asserted reasons. *Fuentes*, 32 F.3d at 765.

Here, Rajendran has pointed to evidence that the Agency did, in fact, make it difficult for him to attend the training by not reserving a rental car for him. *See doc. 63-3* ¶¶ 50, 90.  There thus exists a genuine factual dispute of whether the rental car was reserved.  Accordingly, we find a genuine dispute over material facts, and we will deny the motion for summary judgment insofar as it seeks

judgment on the training retaliation claim based on the Agency's actions regarding the August 2010 Pro/E Training.

### 4. Suspension Burden Shifting.

As fully analyzed above, at this juncture, Rajendran has set forth a prima facie case for discrimination and retaliation based on his three-day suspension. The burden of production now shifts to the Secretary "to provide a legitimate, non-discriminatory" and non-retaliatory "reason for [her] actions." *See Fowler*, 2021 WL 5540844, at *4; *see also Carvalho-Grevious*, 851 F.3d 249, 257.   In her brief in support, the Secretary explains that Rajendran's suspension was justified because it was based on Rajendran's AWOL and failure to attend the August 2010 Pro/E Training. *See doc. 62* at 28–29.  The Secretary describes the three-day suspension as a "mid-range penalty" "chosen after consultation with Tobyhanna's Management-Employee Relations department[.]" *Id.* at 29.  The Secretary thus meets her burden.

The burden now shifts to Rajendran to show that "the legitimate reasons offered by the [Secretary] were not [the Agency's] true reasons, but were a pretext for discrimination" and retaliation. *Jones*, 198 F.3d at 410.  As outlined above, the Agency relied on a table of penalties to determine Rajendran's suspension. *See doc. 61-3* at 692.  Along with this table of penalties, Mormon completed a

checklist of various factors considered in determining the penalty. *See id.* at 693–94.  The first factor is "seriousness of offense." *Id.* at 693.  The form asks, "How does the charged conduct affect the [A]gency's operations and/or mission?" *Id.* Morman answered this question as follows: "By not attending when scheduling, employee is now contending that management is discriminating against him for not sending him." *Id.*  Rajendran characterizes this statement as "direct evidence of retaliation." *Doc. 63* at 6.

This checklist was for the purpose of determining Rajendran's punishment. It raises the inference that Morman considered, albeit along with other factors, Rajendran's complaints of discrimination.  Rajendran thus meets his burden to demonstrate that the Agency's nondiscriminatory and nonretaliatory reasons for suspending him were pretextual. *See Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994) ("to defeat summary judgment when the defendant answers the plaintiff's prima facie case with legitimate, non-discriminatory reasons for its action, the plaintiff must point to some evidence, direct or circumstantial, from which a factfinder could reasonably . . . believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action."); *see also Daniels*, 776 F.3d at 198–99 (applying the same standard to retaliation cases).  Thus, we again are faced with a genuine dispute of material facts, and, accordingly, we will deny the motion for summary judgment insofar as

it seeks judgment on Rajendran's discrimination and retaliation claims based on his

suspension.

### 5. Demotion Burden Shifting.

We turn now to the Secretary's proffered legitimate, nondiscriminatory and

nonretaliatory reason for Rajendran's demotion.  In her brief in support, the

Secretary argues that Rajendran was "reassigned" in March, at the end of his

probationary term as a result of "his consistently poor performance and work

ethic[.]" *Doc. 62* at 24.  Rajendran, however, continues to dispute this

characterization of his performance and any claim that his demotion was voluntary.

*Doc. 62* at 19–20.  Further, Rajendran points out that the Army "started a new

demotion process in September within the [Maintenance Engineering Division,]"

distinct from the reassignment to a GS-7 level in the Design, Development, and

Manufacturing Division to which he "agreed" in March. *Id.* at 20.

Confusingly, in her brief in support, the Secretary fails to meaningfully

engage with the evidence she herself provided that, despite Rajendran's agreement

to a transfer to the Design, Development, and Manufacturing Division in March

2010, he was not transferred, and in September 2010, Morman had discussions

with Management-Employee Relations and a Mr. George Brady about the

possibility of keeping Rajendran as a level GS-9 engineer within the Maintenance

Engineering Division and then demoted him to a level GS-7 technician within that same division. *See doc. 61-3* at 215; *doc. 61-9* at 2; *see also doc. 63-3* ¶ 47–49. The Secretary only addresses Rajendran's actual demotion in her reply brief, in which she argues "even if Rajendran is correct in everything he says, his superiors had ample reason to believe that he was a dud as an engineer at the installation and that he needed to be reassigned as a technician." *Doc. 64* at 9.  The Secretary, thus, raises in the reply brief, for the first time and without citing the statement of material facts, that the September decision to demote Rajendran within the Maintenance Engineering Division was based on his poor performance as a level GS-9 engineer. *See id.*

Accordingly, we find that the Secretary has failed to meet her burden to provide a nondiscriminatory and nonretaliatory reason for the adverse action in question—here, Rajendran's actual demotion to GS-7 within the Maintenance Engineering Division in October 2010.  We will, therefore, deny the motion for summary judgment insofar as it seeks judgment on Rajendran's discrimination and relation claims for his demotion.

## B.  Claim Based on Violation of the OFO's Order.

Rajendran's final claim alleges that the Agency failed to comply with the OFO's Order to return Rajendran to the status quo prior to the signing of the

breached settlement agreement. *Doc. 17* at 17–18.  The Secretary seeks summary

judgment on this claim as well.  For clarity, we set forth the entirety of the

Secretary's argument on this point below:

> The OFO ordered the Army to restore Rajendran to the status
> quo prior to signing of the settlement agreement in January
> 2011.  Rajendran complains that [t]his did not occur because he
> was placed in the Design, Development, and Manufacturing
> Division instead of the Maintenance Engineering Division.  But
> the latter was where Rajendran had originally been placed when
> he started at Tobyhanna.  And his reassignment to the former[,
> the Design, Development, and Manufacturing Division,] had
> already taken place as of October 2010, several months before
> the agreement was executed.  On that basis, the Army did
> comply with the OFO order and Rajendran is seeking
> something beyond that order, namely placement in his original
> position.  Because he thus seeks relief beyond the mandate of
> the OFO, judgment in favor of the Army is warranted on
> Rajendran's claim alleging noncompliance.

*Doc. 62* at 29–30 (internal citations omitted).

But Rajendran argues that his demotion in October 2010 actually took place

within the Maintenance Engineering Division. *Doc. 63* at 24.  And, as explained

above, the evidence supports this assertion. *See doc. 63-3* ¶¶ 47 – 49; *see also doc.

61-9* at 2.  The Secretary fails to point to any evidence that after Rajendran's

demotion to GS-7 within the Maintenance Engineering Division, but prior to

January 2011, Rajendran was placed in the Design, Development, and

Manufacturing Division.

In her reply brief, the Secretary finally acknowledges that Rajendran was not placed in the Design, Development, and Manufacturing Division at the time of the settlement. *See doc. 64* at 12.  But she argues that Rajendran cannot dispute that he was in a GS-7 position at the time of the settlement agreement. *Doc. 64* at 12. And, she argues, Rajendran "has not shown that there was any difference in the position, grade, salary, hours, or general duties between the two GS-7 positions at issue." *Id.*  Further, the Secretary argues that "Rajendran cites no case law establishing that a reinstatement after years of absence requires placement in the exact same position located under the same directorate/division/supervisor." *Id.* She also argues that Rajendran performed work in the Design, Development, and Manufacturing Division in 2010 "shortly before the settlement" (*id.*), although we must note that the OFO Order referred only to Rajendran's position at the time of settlement, not some vague time "shortly before" the settlement. *See doc. 61-10* at 5–6.  The Secretary cites caselaw to support her assertion that reinstatement need only be reasonable, but she fails to cite to the record to show that the contemplated indicators of reasonableness are present here. *See doc. 64* at 13.  And, again, the Secretary raises such argument for the first time in her reply brief. *See Pelullo*, 399 F.3d at 222 ("It is well settled that an appellant's failure to identify or argue an issue in his opening brief constitutes waiver of that issue on appeal."); *see also Sloan*, 2017 WL 3495190, at *5 n.4 ("Like an issue raised for the first time in an

appellate brief, issues raised for the first time in a reply brief supporting [a pretrial motion] are deemed waived because the opposing party typically does not have the opportunity to respond.").  Accordingly, we will deny the motion for summary judgment on Rajendran's claim for non-compliance with the OFO Order.

## VI.  Conclusion.

For the foregoing reasons, we grant in part and deny in part the defendant's motion (*doc.* 55) for summary judgment.  Specifically, we grant summary judgment on the training discrimination claim and the training retaliation claim except as it relates to the August 2010 Pro/E Training. We deny summary judgment on all other claims.  Accordingly, the following claims remain:

(1) The suspension discrimination claim;
(2) The demotion discrimination claim;
(3) The training retaliation claim only insofar as it relates to the August 2010 Pro/E Training;
(4) The suspension retaliation claim;
(5) the demotion retaliation claim;
(6) The status quo retaliation claim; and
(7) the claim for failure to abide by the OFO's Order.

An appropriate Order follows.


*S/Susan E. Schwab*
Susan E. Schwab
United States Magistrate Judge